FILED
2010 Oct-29 PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* ELIZABETH LATTANZI | ) | |
| and BARBARA HUFFSTETLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No: _  CV-10-K-2928-S |
| | ) | |
| VISTACARE, INC. d/b/a | ) | |
| VISTACARE HOSPICE, ODYSSEY | ) | **FILED UNDER SEAL** |
| HEALTHCARE, INC., | ) | **DO NOT PLACE IN PRESS BOX** |
| and GENTIVA HEALTH SERVICES, | ) | **DO NOT ENTER ON PACER** |
| | ) | |
| Defendants. | ) | **DEMAND FOR JURY** |

### *QUI TAM* COMPLAINT

Plaintiff-Relators Elizabeth Lattanzi and Barbara Huffstetler, on behalf of themselves and the United States of America, allege and claim against VistaCare, Inc., doing business as VistaCare Hospice, Odyssey Healthcare, Inc., and Gentiva Healthcare Services, as follows:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendants submitted and caused to be submitted within this judicial district false claims for hospice care for ineligible patients and false claims for palliative care which should have been paid for by Defendants, and made or used false records material to such claims.

## PARTIES

3.      Defendant Gentiva Healthcare Systems (Gentiva) is one of the nation's largest providers of Medicare-supported healthcare services for the elderly. Gentiva provides hospice and home health care to some 30,000 patients a day in 30 different states. In August, 2010, Gentiva acquired Defendant Odyssey Healthcare, Inc. (Odyssey), then one of the nation's largest hospice providers, for approximately $1 billion. Odyssey previously acquired Defendant VistaCare, Inc.

2

(VistaCare) in 2008. Gentiva continues to offer hospice services to Medicare and Medicaid beneficiaries under the VistaCare name. Through their experience as VistaCare employees, Plaintiff-Relators have learned that Defendants conduct their hospice operations with the fraudulent intent to defraud the United States by billing for ineligible hospice patients and by avoiding the cost of palliative care for legitimate hospice patients.

4.     Plaintiff-Relator Barbara Huffstetler is a registered nurse employed at VistaCare. Ms. Huffstetler has served for some 26 years in the healthcare field as a nurse and manager and has been employed as a case manager and admissions nurse at VistaCare since 2008. In the course of her employment, Ms. Huffstetler has become increasingly concerned over VistaCare's practice of admitting non-qualifying hospice patients. Ms. Huffstetler has personally reviewed numerous patient documents and conducted in-person patient visits that demonstrate that patients who do not qualify for the Medicare Hospice Benefit have been fraudulently admitted and certified by Defendants and submitted for reimbursement from the Government through Medicare. Ms. Huffstetler has been directly instructed by supervisors and corporate managers – and has witnessed the instruction of other nurses – to admit ineligible, non-terminal patients and to falsify paperwork where necessary in order to conceal Defendants' fraud.

3

5. Plaintiff-Relator Elizabeth Lattanzi holds a Bachelor of Science Nursing degree from Syracuse University and has worked intermittently as a nurse since 1977. In 2009 Ms. Lattanzi was employed by VistaCare as a case manager. Ms. Lattanzi's experience has confirmed Defendants' practices of recruiting and billing for non-terminal, inappropriate hospice patients; falsifying patient diagnoses to cut costs; and eliciting fraudulent patient revocations to avoid paying for expensive palliative treatment.

6. Through their experience, Plaintiff-Relators have witnessed so many instances of fraud as to believe that Defendants' false certifications, fraudulent billing, and tactics of evasion are widespread, systematic practices endemic to Defendants. Defendants' fraudulent practices offend Plaintiff-Relators' long-standing dedication to the mission of hospice care and to the needs of terminally-ill patients and cause them to file this Complaint on behalf of themselves and the United States as original source relators under the *qui tam* provisions of the False Claims Act.

7. Prior to filing this Complaint, Plaintiff-Relators voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Plaintiff-Relators are the original source of the information for purposes of that Section. Alternatively, Plaintiff-Relators have knowledge that is independent of

4

and materially adds to any purported publicly disclosed allegations or transactions, and Plaintiff-Relators voluntarily provided that information to the Government before filing this Complaint. Plaintiff-Relators are serving contemporaneously herewith a statement of the material evidence in their possession upon which their claims are based.

## THE MEDICARE HOSPICE BENEFIT

### I. Background

8. Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

9. Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care. *See* 42 U.S.C. § 1395d. A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course." 42 C.F.R. § 418.3. In electing hospice care, a patient must agree to forego Medicare coverage for curative treatment. *See* 42 U.S.C. § 1395d. A patient may at anytime revoke his or her Medicare Hospice Benefit election and resume Medicare Part A coverage. 42 C.F.R. § 418.28.

5

10. Defendants' aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving. The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 On Death and Dying is acknowledged to have altered modern perceptions about care for the terminally ill. In the 1970s, U.S. hospices opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients. Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Kübler Ross stated: "We should not institutionalize people. We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial help in order to facilitate the final care at home." In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986. By 1990, 800 Medicare Hospice Benefit companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

11. From such humble, altruistic roots, Medicare Hospice Benefit has become big business. Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006. In the 1998 article "Hospice Boom Is Giving Rise to New Fraud," the *New York Times* recognized that the hospice infrastructure "was never designed to handle the expanding network of nursing homes, hospices, assisted-

6

care centers and other services popping up to serve the nation's growing aging population." Venture capitalists and other investors have been quick to perceive that the Medicare Hospice Benefit represents a potentially unlimited stream of income for those who bring aggressive marketing, sales, and growth tactics into the new industry of care for the dying.

12.     Leslie Norwalk, then Acting Director of the Centers for Medicare & Medicaid Services, testified before the U.S. House of Representatives Committee on Ways and Means in 2007 that "Hospice is not intended to be used as a nursing home." Nevertheless, Defendants and other for-profit hospice companies have instituted a fraudulent scheme to treat the Medicare Hospice Benefit as an improper subsidy for general nursing home and in-home care and to capitalize on and aggressively market to the nation's rapidly growing elderly population.

## II.     Hospice Benefits, Reimbursements, and Requirements

13.     The Medicare Hospice Benefit covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician. *See* 42 C.F.R. § 418.22. Hospice care is designed to provide pain-relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, physical and occupational therapy, counseling, home health aide and homemaker services, short-term

7

inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

14. Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day a qualified beneficiary is enrolled. 42 C.F.R. § 418.302. Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

15. In return for the *per diem* payment, hospices are obligated to provide patients with all covered palliative services. *See* 42 C.F.R. § 418.202. The hospice must design a plan of care inclusive of all covered services necessary to meet the patient's needs. *See* 42 C.F.R. § 418.56. Among other services, every hospice must provide short-term inpatient care for pain-control and symptom-management related to the patient's terminal illness. *Id.*; *see also* 42 C.F.R. § 418.108.

16. Medicare will not pay for hospice services provided to patients who are not terminally ill. *See* 42 U.S.C. §1395y. Furthermore, it is a universal

8

requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

17.     Federal law authorizes Medicare administrative contractors ("MACs") and fiscal intermediaries ("FIs") to issue determinations as to the extent of Medicare coverage for particular items or services. *See* 42 U.S.C. 1395ff. Accordingly, MACs and FIs publish local coverage determinations ("LCDs") establishing requirements for and limitations on hospice coverage. *See, e.g.,* LCDs Published by Palmetto GBA, Alabama Home Health/Hospice FI, *available at* http://www.cms.gov/mcd/results_index.asp?from='lmrpstate'&contractor=88&name=Palmetto+GBA+%2800380%2C+RHHI%29&letter_range=4. Medicare will not pay for hospice care provided to a patient who does not meet LCDs. *See* 42 U.S.C. 1395y.

18.     To enroll as Medicare providers, Defendants were required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, Defendants made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The

> Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

19.     Defendants then billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary (FI) or Medicare Administrative Contractor (MAC) responsible for administering Medicare hospice claims on behalf of the United States. *See* CMS Form 1450. Each time they submitted a claim to the United States through the FI, Defendants certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations.

20.     Defendants thus certified that each claim for a *per diem* payment represented a day of care provided to a terminally ill patient, and CMS expressly conditioned its payment on the truth and accuracy of that certification. Defendants further certified that their programs were in compliance with Medicare regulations, including the requirement that Defendants provide short-term in patient care related to their patients' terminal conditions.

## DEFENDANTS' FRAUDULENT SCHEMES

### I.      Billing for Ineligible Hospice Patients

21.  Defendants systematically defraud Medicare and Medicaid by recruiting and cycling non-qualifying patients through their hospice programs.

22.  Defendants actively recruit, certify, and bill for ineligible patients. As detailed below, VistaCare Montgomery Clinical Director Sharon Connell consistently orders VistaCare nurses – including Plaintiff-Relator Barbara Huffstetler, the office's primary admitting nurse – to falsify paperwork in order to make non-terminal patients appear hospice-appropriate. Connell frequently tells VistaCare nurses that if a patient is not appropriate they should "just put them on for 90 days and watch them."

23.  The VistaCare Montgomery Medical Director, Dr. Mont Highley, and physician Dr. Malcolm Brown are complicit in Defendants' fraud and knowingly certify as terminal patients whom they know do not fit the criteria set forth in 42 C.F.R. § 418.3 and the applicable LCDs.  Drs. Highley and Brown also fraudulently sign "blank" certifications that do not contain and are not based upon information necessary to make a medical judgment of terminal illness.  During IDG meetings, Plaintiff-Relators have repeatedly witnessed Drs. Highley and Brown sign certifications of terminal illness based on blank, non-existent nursing notes and in the absence of the patients' case managers. The nurses then "fill in" the information at a later time. On October 26, 2010, for example, in the presence of Plaintiff-Relator Huffstetler and other staff, Dr. Highley signed blank

11

certifications for patients of a nurse who was absent. In or around August, 2010, Dr. Brown falsely certified the patients of nurse Kelley Yoland, over blank nursing notes and with no information about the patients' current conditions, while she was on vacation.

24.    Under pressure from Connell, Defendants' nurses admit nearly every patient referred to VistaCare even though many of those patients are not terminally ill and do not qualify for the Medicare Hospice Benefit. Plaintiff-Relators estimate that at least 33% of the current patient census at VistaCare's Montgomery office is inappropriate and ineligible.

25.    The following constitute a representative example of the recent results of Defendants' fraudulent practices; the following patients have been fraudulently certified by Defendants as terminally ill and falsely billed to the United States through CMS:

a.     On or about October 8, 2010, Connell ordered Plaintiff-Relator Huffstetler to admit under a diagnosis of "debility" patient J.M. who is a resident at Capitol Hill Nursing Home in Montgomery, Alabama. Ms. Huffstetler's evaluation revealed that, while suffering from dementia, J.M. was not terminal. In fact, J.M. is extremely active and constantly roams the facility in a walker; the nursing home staff has added weights to J.M.'s walker in an attempt to slow J.M.'s

12

movements. Ms. Huffstetler's assessment rendered a Palliative Performance Score ("PPS") for J.M. of 60%, indicating J.M. requires only moderate assistance. Because Medicare guidelines require that a "debility" patient exhibit a PPS of 40% or lower (*See* LCD No. L6885, *available at* http://www.cms.gov/mcd/viewlcd.asp?lcd_id=6885&lcd_version=37 &basket=lcd%3A6885%3A37%3AHospice+The+Adult+Failure+To+ Thrive+Syndrome%3ARHHI%3APalmetto+GBA+%2800380%29%3 A) Connell ordered Ms. Huffstetler to fraudulently alter the assessment to show a PPS of 50% - which Connell deemed close enough – and to include in J.M.'s care plan unneeded skilled nursing visits with the sole purpose of creating the illusion of a more acute condition. At an interdisciplinary group meeting on October 12, 2010, Dr. Highley reviewed J.M.'s chart for certification. He informed Ms. Huffstetler that, in order to conform with LCDs, J.M. needed a PPS score of 40%, rather than 50%. Dr. Highley nonetheless falsely certified J.M. as terminally ill. Ms. Huffstetler relayed the incident to Connell who told her: "You need to change your paperwork."

b.    Patient T. P. was admitted on or around July 27, 2010 with a diagnosis of chronic obstructive pulmonary disease ("COPD"). T. P. ambulates without assistance or oxygen and his oxygen saturation levels on room air exceed 94%. T. P. climbs 16 stairs to enter his living area with only minimal shortness of breath. T. P. does not fit the Medicare requirements or LCDs for a terminal diagnosis of COPD (See LCD No. L26377, *available at http://www.cms.gov/mcd/viewlcd.asp?lcd_id=26377&lcd_version=10 &basket=lcd%3A26377%3A10%3AHospice+Cardiopulmonary+Con ditions%09%3ARHHI%3APalmetto+GBA+%2800380%29%3A*).

c.    Patient E.C.H., was admitted under a diagnosis of COPD on or about September 23, 2010. On that date, Plaintiff-Relator Huffstetler visited E.C.H. and found her washing dishes and smoking a cigarette. E.C.H's oxygen saturation on room air was 96% - far in excess of guidelines for a COPD diagnosis. E.C.H. has declined assistance from home health aides and can perform daily activities unassisted.

d.    Patient E.R. was admitted on or about September 27, 2010 with a diagnosis of COPD. E.R. is a regular smoker and her oxygen saturation on room air is above 90%. E.R. is the designated care-giver

14

for her mother, who lives next door to E.R. E.R. is not-terminal and does not meet criteria for Medicare Hospice Benefit admission.

e.   Patient M.H.W. was admitted to VistaCare service on or about July 22, 2010 after many months on Odyssey's hospice rolls. M.H.W. was originally admitted for "adult failure to thrive" and later readmitted under a debility diagnosis on or about November 11, 2009. Until very recently, M.H.W. had not experienced significant weight loss or decline in her ability to perform activities of daily living. Both her very long length of stay and her stable condition belie Defendants' repeated diagnoses of terminal illness.

## II.   Fraudulently Altering Patient Diagnoses and Withholding Care to Avoid Costs

26.   In violation of Medicare regulations, Defendants deliberately falsify patient diagnoses in order to avoid paying for costly treatments or medication. As a result, Defendants' patients are deprived of care.

27.   As outlined above, participation in the Medicare Hospice Benefit requires Defendants to provide patients with all necessary palliative care related to their hospice diagnosis and to design a plan of care to meet the patients' needs. *See, e.g.,* 42 C.F.R. § 418.54; 418.56.

28.   In derogation of their legal and ethical responsibilities, Defendants frequently admit patients under false diagnoses in order to avoid cost. For

example, a diagnosis of debility is potentially more expensive than a diagnosis of dementia, since a hospice is likely to be responsible for any costs associated with the physical decline of a debility patient. Accordingly, without regard to patient care and with the sole goal of cutting costs, Defendants frequently admit patients under diagnoses which are not tied to the patients' actual terminal condition. The following are illustrative of Defendants' fraud:

a. On or about July 16, 2010, Defendants' admitted patient J.S.L. J.S.L. suffered from Parkinson's disease, but did not fit the criteria for a terminal diagnosis of Parkinson's, in that he was not short of breath while resting, did not require oxygen while resting, and had not declined ventilation. Although he was hospice-appropriate under a diagnosis of debility, Connel informed Plaintiff-Relator Lattanzi that he would not be admitted under that diagnosis because his medications were "too expensive." Instead, he was fraudulently admitted under a terminal Parkinson's diagnosis.

b. Patient R.P. is currently on service and is dying of renal failure. R.P. has had a kidney removed due to renal cell carcinoma, which has metastasized. In order to avoid paying for dialysis and other treatment related to and end-stage renal cancer diagnosis, Connell ordered Plaintiff-Relator Huffstetler to admit R.P. under a diagnosis of "end-

stage cardiac." R.P. is dying from renal cancer and a legitimate care plan conforming with Medicare regulations would include palliation and management of the symptoms associated with that condition. Defendants' care plan is falsely premised and violates 42 C.F.R. § 418.201.

## III.  Eliciting and Backdating Fraudulent Revocations for Legitimate Hospice Patients who Require Hospitalization for Palliative Care

29.     Defendants fraudulently increase their profits and shift costs to the United States through a pattern and practice of fraudulently "revocating" legitimate Medicare Hospice Benefit patients who require expensive palliative hospital care. Medicare requires that Defendants bear any costs for palliative care that exceed the standard per-diem amount. The *per-diem* rate paid by the United States to Defendants, however, is generally much less than the actual per-diem cost of even a routine hospital stay for palliative treatment. Unwilling to absorb such high costs of hospital care, Defendants fraudulently shift these costs to the United States through false revocations. In order to boost their profit margin, Defendants fraudulently cause and coerce patients to revoke the Medicare Hospice Benefit for the duration of the patient's hospitalization in order to fraudulently shift these expensive costs to the United States.

30.     Even more egregiously, an extremely high percentage of Defendants' revocations are fraudulently backdated in order to evade costs. If Defendants fail

17

to elicit a revocation from the patient prior to her hospital admission, they simply coerces the patient into signing the revocation form after hospital admission, leaving the date blank, then fraudulently back-date the revocation in order to make it appear that the patient had revoked Hospice prior to hospitalization so that the hospital costs would be borne by the United States through Medicare and Medicaid. Defendants' practice in is direct violation Title 42, CODE OF FEDERAL REGULATIONS, 418.28. As a result of the scheme, the United States pays a full Medicare fee-per-service rate for care that it has already paid for at the lower Hospice per-diem rate.

31. The following are examples of VistaCare patients who have been fraudulently revoked and whose palliative treatment has been falsely billed under the Medicare Part A hospital benefit when it should have been borne by Defendants:

a. Patient E.S. has been on and off the VistaCare rolls since mid-spring 2009, with a diagnosis of COPD. In or around March, 2010, E.S.'s electric wheelchair developed a faulty battery. In order to avoid paying for a new wheelchair, Defendants instructed E.S. to revoke her hospice election. On or about March 2010, E.S. revoked and was admitted to the hospital. She was prescribed a new wheelchair that

18

was paid for by Medicare. On or about September 29, 2010, E.S. was readmitted to Defendants' Medicare Hospice Benefit program.

b.   Patient R.P., described above, is on VistaCare's service under a (fraudulent) diagnosis of terminal cardiopulmonary disease. R.P. was sent to the hospital for complications relating to blood-clots, a condition related to his diagnosis and a symptom of cardiopulmonary disease. Defendants falsely "revocated" R.P. to avoid paying for his palliative hospital care.

c.   Patient J.S.N., a Medicaid patient, is 31 years old and was admitted to VistaCare under a diagnosis of congestive heart disease. On or about October 18, 2010, J.S.N. was sent to the hospital I.C.U. by his treating physician for fluid overload and depleted sodium levels, directly related to his congestive heart failure. When VistaCare administrators learned that J.S.N. had been admitted to the hospital without signing a revocation form, they became extremely upset. On October 19, 2010 VistaCare administrator Susan Lyles, stand-in PCM, instructed Plaintiff-Relator Huffstetler to call the patient's spouse and "get her to sign a revocation," handing her a revocation form backdated for October 18,2010. Plaintiff-Relator Huffstetler responded that the date was incorrect and asked permission to correct it to the actual date.

Ms. Lyles responded: "No, we need to get him off yesterday so we don't have to pay for two days in ICU and all his medications." Thereafter, the patient's spouse was instructed to sign the revocation form, dated October 18, 2010. Shortly thereafter on the same day, J.S.N. died, leaving behind his common law wife and two children (8 years-old and 2 years-old). The practical result was that, after the United States had paid Defendants for hospice care, J.S.N.'s family was denied bereavement services. To fraudulently cut costs, VistaCare abandoned J.S.N. and his family during the hour of their greatest need, not only avoiding VistaCare's obligations but also defeating the very purpose and mission of hospice.

32. By and through all of the circumstances described, *supra*, Defendants have violated United States healthcare laws and regulations, undermined the noble intention and mission of the Medicare Hospice Benefit, defrauded the United States, and jeopardized the already overly strained Medicare program.

**COUNT ONE**
**PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS**
**UNDER 31 U.S.C. § 3729**

33. Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

20

34. By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a) Defendants submitted false claims for Medicare Hospice Benefit care provided to patients whom Defendants knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b) Defendants submitted false claims for Medicare Hospice Benefit care provided to patients admitted under a false diagnosis and to whom Defendants did not provide complete palliative services under a legitimate care plan as required by 42 C.F.R. §§ 418.201; 418.56.

(c) Through fraudulent revocations, Defendants caused hospitals and other healthcare providers to submit false claims under Medicare Part A for care that should have been paid for by Defendants by reason of their obligations as Medicare hospice providers under 42 C.F.R. §§ 418.201, *inter alia*.

(d) Defendants submitted false claims for Medicare Hospice Benefit services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

21

35. The United States paid the false claims described herein and summarized in paragraph 34(a)-(d).

36. Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of Medicare Hospice Benefit patients and fraudulent billing of the United States through Medicare or Medicaid.

37. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

38. Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

39.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     Defendants created and used false certifications of terminal illness, false admission paperwork indicating fraudulent diagnoses; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support their fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)     Defendants made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendant was aware that their practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

(c)     Defendants made or used or caused to be made or used fraudulent revocation forms, many fraudulently backdated, intended to create the false appearance that patients required and elected to receive aggressive curative treatment when in fact the treatment required was palliative in nature and should

have been paid for by Defendants pursuant to *See* 42 C.F.R. §§418.201; 418.56, *inter alia*;

40. The false records or statements described herein and summarized in paragraph 39(a)-(c) were material to the false claims submitted or caused to be submitted by Defendants to the United States.

41. In reliance upon Defendants false statements and records, the United States paid false claims submitted by Defendants and others that it would not have paid if not for those false statements and records.

42. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States for such false or fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

43. Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

44. By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

(a) Defendant knew that they had received millions of dollars in Medicare Hospice Benefit *per diem* patients who did not qualify for Medicare Hospice Benefit, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

(b) Defendant knew that the United States had paid millions of dollars for palliative hospital in-patient treatment that should have been paid for by Defendants, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

45. As a result of Defendants fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendants

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

### COUNT FOUR
### FRADULENT INDUCEMENT UNDER 31 U.S.C. § 3729

46.     Plaintiff-Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

47.     By and through the actions described herein, Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims, to wit:  Defendants fraudulently induced the United States to pay per-patient *per-diem* fees for patient care that Defendants never intended to provide.

48.     Through submission of CMS Form 855A and otherwise, Defendants agreed to provide care to patients in return for a per-patient *per-diem* payment from the United States through CMS.  By regulation, including 42 C.F.R. § 418.201, United States made it clear that such per-patient *per-diem* payments were consideration for Defendants' agreement to provide ongoing, complete palliative patient care; and Defendants' agreement to provide such ongoing, complete palliative care was – in fact – a condition of the United States' per-patient *per-diem* payments to Defendants.

26

49.     At the time that Defendants requested and accepted the per-patient *per-diem* payments, they intended to avoid the high costs of palliative-care procedures and medications by inducing patients to temporarily revoke their Medicare Hospice Benefit election in order that such expensive procedures should be billed under Medicare Part A. To that end, Defendants induced the patients and described *supra* to revoke their Medicare Hospice Benefit election in order to shift the high costs of hospital procedures and prescription medications away from Defendants.

50.     Accordingly, the United States was misled by Defendants' material misrepresentation that it would provide palliative care for such patients, which Defendants ultimately avoided through fraudulent revocation. In many instances, after the expensive procedures were completed the patients were fraudulently re-certified for Medicare Hospice Benefit.

51.     By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false records or statements, including but not limited to fraudulent revocation documents and back-dated revocation records and false claims for payment to the United States related to the per-patient *per-diem* claims for payment. Such false records or statements were used by Defendants to get false or fraudulent claims paid or approved by the United States.

52. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the payments made to Defendants and others by the United States through Medicare for all patients whose hospice election was fraudulently revoked.

WHEREFORE, Plaintiff-Relators requests entry of judgment in his favor on behalf of the United States and against Defendants in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT FIVE
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(3)

53. Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

54. Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly certified and/or re-certified Medicare Hospice Benefit patients whom they knew did not qualify for Medicare or Medicaid reimbursement and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

55. The Government paid Defendants for such false claims.

56. Defendants, in concert with their principals, agents, employees, subsidiaries, and other institutions did agree to submit such false claims to the United States.

57. Defendants and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare or Medicaid.

58. Defendants' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 21 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT SIX
## SUPPRESSION, FRAUD, AND DECEIT

59. Plaintiff-Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

60. Defendants misrepresented or suppressed the material fact that a substantial number of their patients enrolled in Medicare Hospice Benefit do not qualify for Medicare Hospice Benefit and are not terminally ill.

61. Defendants were legally obligated to communicate to the United States that they had enrolled patients to Medicare Hospice Benefit and that they had billed the United States for services to patients who do not qualify for Medicare Hospice Benefit and who are terminally ill.

62. Such misrepresentations were made willfully to deceive or recklessly without knowledge.

63. The United States acted on Defendants' material misrepresentations described herein to its detriment.

64. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and against Defendants pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Defendant's fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Defendant from engaging in such

conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Plaintiff-Relators may be entitled.

Date: October 29, 2010.

_____

HENRY I FROHSIN
JAMES F. BARGER, JR.
J. ELLIOTT WALTHALL

Attorneys for Plaintiff-Relators
Elizabeth Lattanzi and
Barbara Huffstetler

**OF COUNSEL:**
FROHSIN & BARGER, LLC
One Highland Place, Suite 310
2151 Highland Avenue
Birmingham, Alabama 35205
Tel:   205.933.4006
Fax:   205.933.4008

**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

31

On this the 29th day of October, 2010, Plaintiff-Relators hereby certify that

in compliance with Federal Rule 4 of the Civil Rules of Procedure, service of the

*Qui Tam* Complaint has been executed as follows:

**By Hand-Delivery to:**

United States Attorney, Joyce White Vance
Attn: AUSA Lloyd C. Peebles
1801 Fourth Avenue North
Birmingham, AL 35203


**By Certified Mail to:**

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001